UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-40343
SUMMARY CALENDAR

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

LARRY JOE FERRELL,

Defendant - Appellant.

On Appeal from the United States District Court for the
Eastern District of Texas, Sherman Division
(4:01-CR-17-8)

October 29, 2002

Before REYNALDO G. GARZA, JONES, and DENNIS, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:[1]

In this appeal we review the sentence imposed by a district court, which resulted from the guilty-plea conviction of Defendant, Larry Joe Ferrell, for conspiracy to possess a listed chemical with intent to manufacture, possess or distribute, knowing the listed chemical would be used to manufacture a controlled substance. For the following reasons, we affirm the district court's

---

[1]Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

-1-

judgment.

I.

In March of 2001, a five-count indictment was returned against Larry Joe Ferrell and eleven co-defendants. In count two of the indictment, the co-defendants were charged with conspiracy to possess a listed chemical –i.e., iodine– with intent to manufacture a controlled substance –i.e., methamphetamine– in violation of 21 U.S.C § 846 and 18 U.S.C § 2.

On April 17, 2001, Ferrell pled guilty to count two of the indictment pursuant to a written plea agreement. In his plea agreement, Ferrell agreed to waive his right to appeal any issues except those related to the application of the Sentencing Guidelines or the basis for any upward departure therefrom.

A Presentence Report (PSR) was prepared on July 17, 2001, and revised on August 14, 2001, in response to objections filed by Ferrell. The PSR ultimately held Ferrell responsible for a total of 453.59 grams of red phosphorous, 1,360.77 grams of iodine and 30.55 grams of methamphetamine, which resulted in a base offense level of 34. The offense level was adjusted for Ferrell's acceptance of responsibility, resulting in a total offense level of 31. Based upon the total offense level and a category II criminal history, a guideline sentencing range of 121 to 151 months was established. The statutory maximum sentence, however, was 120 months. Thus, the district court sentenced Ferrell to 120 months in prison and a three-year term of supervised release. A $100 mandatory assessment was also imposed. Thereafter, Ferrell filed a timely notice of appeal.

II.

Ferrell argues that the district court erred when it denied his objection to the purity rate that was used in the PSR to determine the amount of drugs for which he was responsible. Put

another way, Ferrell argues that there was no scientific evidence cited in the PSR to support a 100% purity rate for the methamphetamine that could have been produced and that, therefore, the district court erred when assigning him a base offense level of 34. The district court's determination regarding the quantity of drugs for sentencing purposes is a factual finding that this Court reviews for clear error. *See United States v. Torres*, 114 F.3d 520, 527 (5th Cir. 1997). The determination need be supported by only a preponderance of the evidence. *See United States v. Gaytan*, 74 F.3d 545, 558 (5th Cir. 1996).

At sentencing, Ferrell objected to the Government's use of a 100% purity rate when determining drug quantity. Ferrell argued that the 30.55 grams of methamphetamine he possessed was a good indicator of what he was capable of producing, that the 30.55 grams was not 100% pure, and that different guidelines govern a mixture or substance containing "methamphetamine" as opposed to "pure methamphetamine" –i.e., methamphetamine with a 90% or higher purity rate.

The district court overruled Ferrell's objection because the finished methamphetamine seized from two co-defendant's tested 90% pure, and that based on the formula used by the other defendants, it was fair to conclude that the iodine Ferrell purchased would have produced methamphetamine with a 90% purity rate. At sentencing, Ferrell agreed that if a 90% purity rate was used rather than a 100% purity rate, the offense level would remain the same. Because the 90% purity rate was within the range of possible purity as testified to by Ferrell's expert, and because it was the same purity rate found in the co-defendants' finished product, there was no clear error. *See Torres*, 114 F.3d at 527.[2]

_____

[2] Furthermore, Ferrell's arguments pertaining to the purity of his 30.55 grams of methamphetamine are untenable. The purity of this quantity was not tested. Given that the co-defendants' methamphetamine was tested, it provides a much more accurate projection of purity.

III.

For the foregoing reasons, the judgment of the district court is AFFIRMED